**KELLYE L. SMITH**                                                                              **Plaintiff**


**vs.**                                                                              **Civil Action No. 2:06cv79**


**MURPHY & SONS, INC. and**
**STEVE GROSS, in his individual capacity**                                          **Defendants**


<u>ORDER</u>

This cause comes before the court on the motion of defendants Murphy & Sons, Inc. and

Steve Gross for summary judgment, pursuant to Fed. R. Civ. P. 56.  Plaintiff Kellye L. Smith has

responded in opposition to the motion, and the court, having considered the memoranda and

submissions of the parties, concludes that the motion should be granted in part and denied in

part.

This is, *inter alia*, a Title VII sexual harassment action arising out of plaintiff's former

employment at defendant's Southaven facility.   Plaintiff contends that she was employed as an

accounting manager for defendant's construction business, while defendant maintains that she

was hired as an "administrative/clerical assistant."  It is undisputed that, while working for

defendant, plaintiff performed work not only for Murphy & Sons, but also for C&M Builders,

which business was located in the same building as Murphy & Sons.  Like Murphy & Sons,

C&M Builders (C&M) was owned 50% by Gary Murphy and 50% by Steve Gross, and the

parties agree that, when plaintiff was performing for C&M, she was supervised by Gross.  The

present case arises out of allegations that plaintiff suffered persistent sexual harassment at the

hands of Gross, which harassment allegedly took the form of, among other things, numerous inappropriate comments regarding her breasts and sending her sexually explicit e-mails.

Plaintiff maintains that, in spite of her complaints to Gary Murphy, Gross's harassment continued and became so intolerable that she was forced to take FMLA leave in March, 2005. On May 18, 2005, plaintiff filed a charge with the EEOC, alleging that she was being discriminated against on the basis of her sex by being subjected to sexual harassment and by being paid less than a male co-worker. Plaintiff formally resigned her position on June 23, 2005 without having returned from FMLA leave, and on May 3, 2006, plaintiff filed the instant lawsuit in this court. Defendants have presently moved for summary judgment, contending that no genuine issue of fact exists regarding their potential liability and that they are entitled to judgment as a matter of law.

The court first considers defendant Murphy & Sons' motion for summary judgment as to plaintiff's sexual harassment/hostile work environment claim against it. In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the U.S. Supreme Court held that sexual harassment which is sufficiently "severe or pervasive" to alter the conditions of the plaintiff's employment and create an abusive working environment may support recovery under Title VII. The Fifth Circuit recently noted that "[h]arassment need not be severe and pervasive to impose liability; one or the other will do." *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 435 (5ᵗʰ Cir. 2005). To state a Title VII hostile work environment claim relating to harassment by either a co-worker or supervisor, a plaintiff must first establish (1) that she belongs to a protected class, (2) that she was subject to unwelcome harassment, (3) that the harassment was based on her protected characteristic, and (4) that the harassment was so severe

2

or pervasive as to affect a "term, condition or privilege" of employment. *Woods v. Delta Beverage Group., Inc.*, 274 F.3d 295 (5th Cir.2001) (*citing Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871, 873 (5th Cir.1999)).

For summary judgment purposes, the court is required to consider the facts in the light most favorable to plaintiff, as the non-moving party. Accordingly, the court will quote directly from the allegations set forth in plaintiff's brief, which are based primarily upon plaintiff's deposition testimony. In her brief, plaintiff alleges that she was the victim of a persistent pattern of sexual harassment on the part of Steve Gross, as follows:

> Mr. Gross frequently make inappropriate comments . . . it escalated . . . when [plaintiff's] office was moved from next to Gary's office to Steve's office, from the front of the building back to the back of the building. ... The sex harassment interfered with her ability to perform her job. According to Smith, "Steve's a very touchy, feely person, and he was constantly touching and grabbing, hugging most things I thought weren't appropriate." Smith never observed Gross being that way with any of the other women in the office. The hostile work environment was constant:
>
> > . . . there were so many times that he said things or did things that were inappropriate . . . So, to give you specific dates and times and all that, I just know that it was an uncomfortable situation for me to work in. I never knew what to expect from him. It was a constant thing.
>
> According to Smith, the first specific incident she could recall of sexual harassment from Steve Gross: "We had a mailbox section here, and [Gross] asked me for something. I reached to the drawer to get it; I put my hand over my blouse, and he started laughing and told me I was a prude and too modest." Smith told Gross that the comment bothered her as did him looking down her blouse, "I told him I wasn't a prude. There was nothing wrong with having some modesty. People show too much skin nowadays." The second specific incident of sexual harassment from Gross that Smith recalled : "I had on a yellow dress, and he came up there and he came around my desk. I was standing at the file cabinet . . . And he grabbed me around the neck with his arm and pulled me down . . . and my dress, . . . it wasn't low cut, but it did have a rounded neck on it, and he went to make a comment about my dress and I should wear it more often." The reason Gross physically pulled Smith's head down was so he could look down her shirt. Smith reported to Gary Murphy's wife, Vickie Murphy who was an officer for the company, the next day that Vickie

worked, that "he's pulling on me again."

Gross clearly had no respect for women; on one occasion Smith was discussing one of the employees, Marilyn Morrison, with Gross, and Gross commented, "all women are one paycheck away from dancing on a table." Smith was highly insulted and told Gross that she would never consider dancing on a table, and she knew many women who felt the same way. As Smith testified, Gross "always had something sexual to say. He would say sexual jokes in front of everyone. It didn't matter if there were women present. He didn't have respect for women."

On a number of occasions, Gross would act like he was pulling a hair or a piece of lint off of Smith's clothing, and this imaginary hair or lint would just happen to be on her chest or breast. On several occasions, Gross would grab her neck like he was going to give her a massage. It happened numerous times and was a constant problem . . . "it was a constant thing that went on." Smith would tell him to stop. When Smith asked to have a desk that was not affixed to the wall, Gross said he did not want it changed because he liked the view the way it was. ....

On another occasion, for approximately ten minutes while talking to Smith, Gross kept rubbing his crotch on the corner of his desk: "He just kept on and on, and me and Ellen were just looking at him. It was disgusting, and he just kept on with it." "He was just talking to us about business, and he kept rubbing his crotch against the corner of my desk." Smith and Ellen told Gary Murphy's wife, Vickie, about it the next day. Vickie apparently did not do anything about the harassment because Gross did the same offensive act again at a later time, around 2004-2005.

On another occasion, Smith complained to Gary Murphy about a calender she saw in one of the offices showing women wearing only G-strings. Not surprisingly, Murphy did nothing about it because he did not find it offensive. The calender stayed on the wall in the office until the calender ran out at the end of the year. There were times when Smith would go to Gross' office door to conduct business, and Gross would be on the Internet watching pornography. Smith told Gross that "it was disgusting." In December 2004, Smith was showing Gross a check in front of Murphy and another employee, Johnny Williams, when Gross asked Smith to lean over so he could look down her sweater. Murphy commented that Gross had embarrassed Smith, to which Smith responded, "no, I'm not embarrassed, I'm mad." Murphy also stated, words to the effect, that if a man's not looking at Smith's ass when she walks by, he's gay. The next day, Johnny Williams went to Smith's office and told her that he "wished he'd never been in there when that happened and he wanted to know how I tolerated Steve's behavior."

During his deposition, Gross admitted to much of the inappropriate behavior:

Q. Have you ever looked down her blouse?
A. Absolutely, I have.
Q. You have looked down her blouse?
A. Yes, sir.
Q. Why?

4

A. It's just a natural reaction whenever she leaned over me. It was just a natural reaction.

. . .

Q. Is that the only time you've looked down her blouse:

A. I would say, no.

Q. Was it a reflex action or was it a conscious action on your part at any of those times?

A. I would say it was conscious.

Q. Have you ever made a comment . . . about the size of her breasts?

A. I would say, yes, but I can't think specifically what I would've said . . .

. . .

Q. . . . do you look at her ass when she walks away from you?

A. Yes.

Further, Gross admitted that when he is standing directly over her and she is wearing a low-cut shirt, he would see her cleavage, and "I would consider it a pleasant view." Gross seemed to be fixated on Smith's breasts, as Smith testified: "It was a constant thing. He'd look at them and say, are you cold, (while looking directly at her breast) . . . he asked me what size bra I wore. He told me . . . pardon me for looking, but I don't have those at home. Just . . . those type of one-liner comments that just leave you floored that you don't know what to say to. It was a constant thing." Smith told Vickie Murphy, and Vickie did nothing to stop the harassment, but merely told Smith, "He's crude sometimes."

On other occasions, Gross would make inappropriate comments like, "hey, Kellye, I'm bored, show me your cleavage or, God, those are huge, referring to my breasts." Another employee, Preston Wiley overhead one of the comments and told Smith, "I can't believe he said that to you." On one occasion, Gross spilt some tea on his shirt and he told Smith, "I spilt tea . . ., you won't have that problem; it will hit your chest before it hits your stomach. Again, it was always something going back to the breasts."

On another occasion, Gross "sent me an email . . . of a very obese woman on top of a very thin man and the caption below it said, does this remind you of anyone. . . the picture I showed him of my family, the people are very large, very obese people. And in the email he sent me, the woman was naked." Smith received numerous offensive emails from Gross, "it got to the point where I wouldn't open them. If it has a picture attached to it, I deleted it."

In the court's view, plaintiff has succeeded in creating triable fact issues regarding whether she suffered "severe or pervasive" sexual harassment affecting the terms and conditions of her employment. While it can be argued that many of Gross's alleged acts of harassment, considered

in isolation, were not particularly "severe," there can be little doubt that the pattern of harassment described above was, in fact, "pervasive."

Having concluded that triable fact issues exist regarding the severity of the alleged harassment in this case, the court must now consider whether fact issues exist regarding defendant's potential liability, vicarious or otherwise, for Gross's alleged actions. In its brief, defendant notes that "if plaintiff was performing work for C&M Builders, Inc., she would report to Steve Gross" and that "[p]laintiff considered Steve Gross to be her supervisor when she worked for C&M Builders, Inc."[1] Defendant thus appears to concede that Gross was plaintiff's supervisor, which would indicate that its liability for any severe or pervasive harassment on the part of Gross would depend upon whether the two-part affirmative defense established by the U.S. Supreme Court in *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) is met.[2]

Under the *Faragher/Ellerth* analysis, even if a plaintiff has failed to prove a "tangible employment action," she may still recover for severe or pervasive harassment that results in a hostile work environment. Unlike in "tangible employment action" cases, however, the employer has the

---

[1]The court would note that plaintiff filed suit against Murphy & Sons, rather than C&M Builders. Defendant concedes that these two businesses have the same owners (Murphy and Gross) and are located in the same building. Moreover, plaintiff testified that she worked for them interchangeably as directed by Murphy and Gross. It is unclear to this court why plaintiff did not name C&M Builders as a defendant but, given the aforementioned facts, it is the court's strong inclination to treat Murphy & Sons and C&M Builders as alter egos of each other for liability purposes. At any rate, if defendant had any valid defenses based upon the identities of the defendants in this case, it has failed to raise them in its summary judgment motion.

[2]Even if the court were to assume *arguendo* that Gross was merely plaintiff's co-worker (which clearly does not appear to be the case), fact issues would still exist regarding whether Murphy & Sons should be held liable for Gross's harassment under a negligence theory.

opportunity to avoid liability for such claims by establishing the elements of a two-part affirmative

defense. *Faragher*, 524 U.S. at 807-08, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

To prevail on the affirmative defense, an employer must prove (a) that it exercised reasonable care

to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee

"unreasonably failed to take advantage of any preventive or corrective opportunities provided by [it]

or to avoid harm otherwise." *Id.*

In this case, defendant does not even mention the *Faragher/Ellerth* affirmative defense,

presumably because it is unable to meet either prong thereof. First, defendant had no formal, written

sexual harassment policy and/or reporting procedures comparable to those established by most

employers which have come before this court. In his deposition, Murphy conceded that his business

had nothing more than an "unspoken" sexual harassment policy:

> Q. . . . do you have a sexual harassment policy [at] Murphy & Sons or C & M
> Builders?
> A. A written policy?
> Q. Any kind of policy.
> A. I would have to say an unspoken policy that basically it's just not tolerated.
> Q. Okay. You have an unspoken policy that it's not tolerated?
> A. Correct.
> Q. How do the employees know about this unspoken policy?
> A. I can't answer that.

Clearly, an "unspoken" sexual harassment policy does not suffice for purposes of establishing the

first prong of the *Faragher/Ellerth* defense.

The court would also note that plaintiff alleges that, in spite of defendant's lack of a formal

sexual harassment policy, she reported Gross's harassment to Murphy:

> Smith reported Gross' sexual harassment to Gary Murphy on numerous
> occasions. However, Smith knew that Murphy would not do anything about it
> because Gross and Murphy were partners. Gary Murphy knew about the sexual

7

harassment because he admitted, "if I said those things to her, she'd have me in court." On one occasion, Smith asked Murphy, "What are we going to do about Steve." Murphy replied, "I don't know what we can do. It's obvious to me that your shingle is not out . . . You're not available. You're very married. You're not interested in any type of extracurricular activity outside your marriage. That's obvious to anyone who meets you."

After receiving the February 2005 offensive email, Smith again reported it to Gary Murphy: "We had already had a prior conversation about Steve, and I had hoped that he would address it, address the issues that I had brought up with him, and this second email let me know that he had not addressed the issues, because it came after we had talked." Previously, Smith had told Murphy, "I didn't like receiving the emails; I didn't like the way Steve was talking with me or to me, comments he was making." All Murphy did was shake his head and say, "you know Steve." Smith had repeatedly spoke to Murphy about Gross' offensive behavior over the course of her employment, but to no avail.

Defendant denies that plaintiff reported Gross's harassment to Murphy, but, regardless, it is apparent that defendant is unable to avail itself of the *Faragher/Ellerth* affirmative defense in this case. Even if this court were to accept defendant's assertion that plaintiff failed to report Gross's harassment, this would not change the fact that defendant's lack of a formal sexual harassment policy precludes it from meeting the first prong of the *Faragher/Ellerth* affirmative defense. Accordingly, the jury will be limited at trial to considering whether plaintiff has proven that she suffered unwelcome sexual harassment which was sufficiently "severe or pervasive" to alter the terms and conditions of her employment, and if so, what damages she suffered as a result.

The court would note at this juncture that defendant has raised a statute of limitations defense, but, in the court's view, this defense is negated by the application of the so-called "continuing violations" doctrine. The Fifth Circuit has recognized this doctrine as an equitable exception to the 180-day Title VII limitations period, and this exception arises "[w]here the unlawful employment practice manifests itself over time, rather than as a series of discrete acts."

*Abrams v. Baylor College of Medicine*, 805 F.2d 528, 532 (5th Cir.1986). The Fifth Circuit has

held that, in order to properly invoke the continuing violations doctrine, the plaintiff must show

that at least one incident of harassment occurred within the 180-day period. *Waltman v.*

*International Paper Co.*, 875 F.2d 468, 474 (5th Cir.1989).

Plaintiff filed her charge of discrimination with the EEOC on May 18, 2005, and,

accordingly, November 18, 2004 is the crucial date for limitations purposes. In addition to the

other acts of harassment described above, plaintiff alleges that the following acts of harassment

occurred after November 18, 2004:

> On December 21, 2004, Smith received another offensive email from
> Steve Gross, of several women, "completely nude, full frontal, sitting down, legs
> spread. You name it, they're doing it." The only reason Smith opened the email
> and did not delete it first is that it was entitled, "help fight terrorism. That's why I
> opened it up. I never dreamed it would contain what it contained." According to
> Smith, this was the "straw that broke the camel's back for me."
> In February 2005, Smith received another offensive email from Gross that
> she opened and forwarded to her attorney. This email had one image that was
> sexually offensive and another image that was racially offensive. Gross admitted
> he sent this email to Smith. ... On March 4, 2005, the last day that Smith actually
> worked at Defendant's office, not surprisingly, Gross sexually harassed Smith.
> While standing over her while Smith was sitting at her desk, Gross looked down
> her shirt and commented, "you know I don't have those at home."

While the aforementioned allegations of harassment clearly fall within the 180-day limitations

period, the court concludes that plaintiff's other harassment claims were also timely filed, based

upon the "continuing violations" exception to the Title VII limitations period.

In the court's view, the present case is a particularly appropriate one for the application of

the continuing violations doctrine, since the alleged discrimination in this case consisted of acts

of harassment which were, to reiterate, not particularly severe in isolation but were pervasive and

"built up over time." In the court's view, it would be inequitable to, in effect, penalize plaintiff

for not immediately filing an EEOC claim after Gross's initial acts of alleged harassment when it

was unclear at that juncture that the harassment would persist and that no actions would be taken

by Murphy in this regard.  The court would also note that the U.S. Supreme Court has been more

willing to find the continuing violations doctrine to be applicable in hostile work environment

cases such as the present one than in other contexts, such as disparate pay claims.  In *National

Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d

106 (2002), for example, the U.S. Supreme Court held that a "Title VII plaintiff raising claims of

discrete discriminatory or retaliatory acts must file his charge within the appropriate 180- or

300-day period, but a charge alleging a hostile work environment will not be time barred if all

acts constituting the claim are part of the same unlawful practice and at least one act falls within

the filing period."   In so concluding, the Supreme Court wrote that:

> Hostile environment claims are different in kind from discrete acts. Their very
> nature involves repeated conduct.   The "unlawful employment practice" therefore
> cannot be said to occur on any particular day. It occurs over a series of days or
> perhaps years and, in direct contrast to discrete acts, a single act of harassment
> may not be actionable on its own.

*Morgan*, 536 U.S. at 115.   In this case, the court concludes that plaintiff's deposition testimony

describes an "organized scheme leading to and including a present violation that is the

cumulative effect of the discriminatory practice," within the meaning of Fifth Circuit authority,

*see Huckaby v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998), and that the continuing violations

doctrine applies in this case.

Although the court has little difficulty in concluding that plaintiff's sexual harassment

claims should be considered by the jury, there is some uncertainty surrounding the circumstances

of plaintiff's departure from defendant's employment, and this uncertainty renders a summary

judgment analysis of plaintiff's remaining federal claims somewhat more difficult. For example,

plaintiff asserts constructive discharge, retaliation and Family and Medical Leave Act (FMLA)

claims, and it seems clear that the viability of these claims depends, at least in part, upon whether

plaintiff quit or was fired from her position. Plaintiff maintains that she was terminated from her

position while on FMLA leave, alleging as follows:

> On March 29, 2005, Gary Murphy wrote to BancorpSouth Credit Card Center:
> "Please cancel the above referenced card name and number and remove from
> account of Murphy & Sons, Inc. Mrs. Smith is no longer employed by Murphy &
> Sons, Inc." ... On May 6, 2005, Gary Murphy canceled Smith's Sam's Club
> membership, stating "she is no longer employed by Murphy & Sons, Inc." Also,
> that same day, Murphy removed Smith from its In View Online Banking, stating
> "she is no longer with Murphy & Sons." Further proof that Smith was fired in
> March 2005, while on FMLA leave, in discovery, Defendants stated that they
> hired Kellye Smith's replacement, Karey Lamney on April 4, 2005.

While plaintiff contends that these actions indicate that she was fired by Murphy & Sons, this

contention is not borne out by other facts in the record.

Defendant notes that, on May 5, 2005, its secretary sent plaintiff a letter requesting that

her physician complete a Certification of Healthcare Provider form for FMLA leave. The

secretary's letter asked plaintiff if she "[w]ould ... also, if possible, confirm your return to work

date as May 27th so that we will be aware of any needed extension of FMLA, as it will be nearing

the entitlement of up to 12 weeks. At that point, we could set up COBRA for benefits if needed."

Clearly, this letter creates a very different impression of plaintiff's employment status than the

aforementioned letters from Murphy, and it clearly refutes plaintiff's claim that defendant had

already fired her. Plaintiff argues that the letters from Murphy at least serve to create fact issues

as to whether she was fired, but it should be apparent that the aforementioned communications

from Murphy to third parties did not have the legal effect of terminating plaintiff's employment.

The court therefore concludes that plaintiff has failed to establish triable fact issues as to whether she was fired by defendant, and, with this conclusion in mind, the court now addresses plaintiff's constructive discharge claims.

A plaintiff who asserts a hostile-environment constructive discharge claim "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004).  In determining whether an employee has been constructively discharged, courts in the Fifth Circuit consider the following factors: (1) whether there was a demotion; (2) whether there was a reduction in salary; (3) whether there was a reduction in job responsibilities; (4) whether there was a  reassignment to menial or degrading work; (5) whether there was  badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) whether there were offers of early retirement that would make the employee worse off, regardless of whether the offer was accepted.  *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994).

In the court's view, there is considerable doubt as to whether plaintiff will be able to demonstrate sufficiently severe harassment to support a constructive discharge verdict in this case.  Considered in the light most favorable to plaintiff, the facts in this case which might arguably support a constructive discharge claim are Gross's harassment itself (which arguably constitutes "badgering, harassment, or humiliation by the employer"), along with the letters written by Murphy stating that plaintiff was no longer employed with the company and cancelling her bank and store cards.  Plaintiff contends that she learned of these letters written by Murphy prior to her resignation, and it strikes this court as reasonable that plaintiff would have

12

interpreted these actions as encouragement to leave. At the same time, the harassment which was

allegedly committed by Gross is not as severe as that in certain other cases which have come

before this court, and this fact tends to militate against submitting plaintiff's constructive

discharge claims to the jury. On the other hand, the fact that defendant lacked a formal sexual

harassment policy and allegedly took no action in response to plaintiff's complaints tends to

support plaintiff's argument that she had no other choice than to quit.

It should also be noted that plaintiff has produced a note from her personal physician

regarding the mental stress which she allegedly experienced as a result of Gross's harassment,

and this evidence arguably serves to buttress her constructive discharge claims, assuming that it

is admissible for this purpose. Smith's physician, Shawn Johnson, MD, wrote shortly before

plaintiff's taking FMLA leave in March, 2005 as follows:

> To Whom It May Concern,
> Mrs. Kellye Smith has been seen in my office on multiple occasions complaining
> of stress and anxiety due to her present job. She has been treated for abdominal
> pain and dermatitis that has been linked to her anxiety. Mrs. Smith has been
> placed on antidepressant and anxiety medications. I have seen her as a follow up
> appointment recently and there has been minimal improvement in her symptoms.
> I believe along with counseling she is now undergoing and medication, it will be
> beneficial to take time off work since her job is the source of her current
> problems. She should continue with her therapist as well as the medication and
> follow up with me for re-evaluation.

It is not clear to this court whether evidence of plaintiff's psychological condition is admissible

in the context of a constructive discharge claim, which, to reiterate seeks to determine whether a

"reasonable person would have felt compelled to resign." *Suders*, 124 S.Ct. 2342, 2354.[3] At any

---

[3]The court invites the parties to submit any authority which they might have on the issue
of the admissibility of the plaintiff's psychological condition in the context of a constructive
discharge claim.

rate, the viability of plaintiff's constructive discharge claims presents a very close issue, and the

court concludes that the better course of action is to wait until after the presentation of evidence

at trial to determine whether a reasonable jury could conclude that plaintiff was constructively

discharged from her position at Murphy & Sons.

The court now turns to the retaliation and FMLA claims asserted by plaintiff. In light of

the court's conclusion that plaintiff resigned her position, this necessarily negates plaintiff's

contention that she was terminated either in retaliation for complaining about Gross's sexual

harassment or for taking FMLA leave. The question arises, however, as to whether defendant's

actions in cancelling plaintiff's bank and store cards might support plaintiff's FMLA or Title VII

retaliation claims. Until recently, the answer to this question would have clearly been "no," but

the U.S. Supreme Court recently broadened the definition of "adverse employment action" in the

Title VII retaliation context (and presumably other retaliation contexts as well) to permit

recovery for actions which a reasonable employee would have found to be "materially adverse."

*Burlington Northern & Santa Fe Railway Co. v. White*, --- U.S. ----, 126 S.Ct. 2405, 165 L.Ed.2d

345 (2006).

While the court recognizes that the scope of "adverse employment actions" has been

expanded by *White*, the court still concludes that cancelling bank or shopping cards does not

suffice to meet the "materially adverse" standard. Indeed, the Supreme Court in *White* wrote

that:

> We phrase the ("materially adverse") standard in general terms because the
> significance of any given act of retaliation will often depend upon the particular
> circumstances. Context matters. ... A schedule change in an employee's work
> schedule may make little difference to many workers, but may matter enormously
> to a young mother with school age children. .... A supervisor's refusal to invite an

14

employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. ... Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others."

*Id.* at 2415-16 (citations omitted). In light of the foregoing, it seems clear that the "materially adverse" standard requires some sort of connection (either direct or indirect) between the adverse employment action and the terms and conditions of plaintiff's employment, and the court sees no such connection under the facts of this case.

Moreover, apart from the "adverse employment action" issue, plaintiff appears to have no evidence, other than temporal proximity, tying these actions to any retaliation which she arguably suffered. Indeed, it is not clear whether plaintiff maintains that Murphy cancelled her bank and shopping cards because she had complained of harassment, because she had taken FMLA leave, or both. Murphy's deposition testimony, buttressed by the aforementioned letter from his secretary, supports a conclusion that his actions in cancelling plaintiff's cards was based upon an assumption that plaintiff might not be returning to work, on her own accord, rather than as an act of retaliation. When asked (indirectly) about his actions in cancelling plaintiff's credit cards, Murphy testified in his deposition that he was uncertain whether plaintiff would be returning to work or not:

Sir, we called out of concern forever trying to get some kind of indication on was she coming back or not coming back. I called her husband myself personally, and he could not tell me anything.

Murphy's belief that plaintiff might not be returning to work was borne out by future events, and it appears that plaintiff did not take steps to make it sufficiently clear that she was not, in fact,

15

quitting her job. Considered in this light, defendant's actions in cancelling the aforementioned

cards appear much less like intentional acts of retaliation than might otherwise be the case.

Accordingly, the court concludes that plaintiff has failed to demonstrate that she suffered an

"adverse employment action" and that, even if she did, no genuine fact issues exists regarding

whether such adverse employment action was motivated by retaliation. This is particularly true

in light of recent Fifth Circuit authority holding that a "but for" causation standard applies in

retaliation claims. *See Strong v. University HealthCare System, L.L.C.*, 482 F.3d 802, 806 (5th

Cir. 2007). Defendant's motion for summary judgment will therefore be granted as to plaintiff's

retaliation and FMLA claims.[4]

The court now turns to plaintiff's disparate pay allegations under the Equal Pay Act and

Title VII. It appears that all but a small portion of plaintiff's Title VII disparate pay claims are

time-barred, based on the U.S. Supreme Court's recent decision in *Ledbetter v. Goodyear Tire &*

*Rubber Co., Inc.*, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007), which provided a very strict

interpretation of the Title VII statute of limitations provision as it relates to disparate pay claims.

In light of *Ledbetter*, the court will assume that plaintiff wishes to seek recovery under the Equal

Pay Act, which has a two-year statute of limitations for non-wilful violations and a three-year

statute of limitations for wilful violations.[5] *See Ford v. Sharp*, 758 F.2d 1018, 1023 (5th Cir.

1985) (noting that the same statute of limitations applies to the EPA and FLSA), 29 U.S.C. §

---

[4]The court would note that these claims are also arguably barred by plaintiff's failure to properly raise them before the EEOC.

[5]Plaintiff should so notify this court if its conclusion in this regard is erroneous. The court will not permit plaintiff to seek double recovery under Title VII and the Equal Pay Act for the same disparate pay allegations, however.

255(a).

The Equal Pay Act obliges an employer to provide equal pay for "equal work on jobs the performance of which requires equal skill, effort and responsibility and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). The operative test is whether a woman is paid less for a job "substantially equal" to a man's; the test relates to job content rather than to job title or description. *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041 (5th Cir.1973). With regard to her disparate pay allegations, plaintiff alleges as follows:

> In 2004, Defendants hired Ken Taylor paying him approximately $13,000.00 per year more than they paid Plaintiff, even though she had been working for them since 1998. Plaintiff was performing essentially the same job duties as Taylor. Smith asked Gross for a raise on several occasions, "but in the end what he told me was that I had pretty much hit the glass ceiling. And I referred him back to my predecessor in saying that she had been there a shorter period of time than me but yet made more money than I did upon her leaving the company and he told me, yeah, but she was sleeping with the boss, meaning Gary [Murphy], not Steve." Smith understood this to mean that if she slept with the boss, she could get a raise. Smith told Gross, "that's not going to happen with me." Smith also told Murphy about these comments the next day. Murphy did not deny it and just "shook his head."

> In December 2004, Smith confronted Gross about the fact that they had hired Ken Taylor, a bookkeeper, doing essentially the same job as Smith, but was paying him approximately $13,000.00 more per year. In an admission by a party opponent, the only thing Gross told Smith as to why Taylor made more money than her was because he was a man. Smith told Murphy what Gross had told her, and in a further admission by a party opponent, Murphy did not deny it.

Plaintiff thus focuses on the amount paid to Ken Taylor in alleging that she was paid less based on her status as a woman.

In the court's view, defendant has submitted somewhat persuasive evidence distinguishing Taylor's job and responsibilities from those of plaintiff. Specifically, defendant argues as follows:

17

In this case, it is clear that Plaintiff's position with Murphy & Sons, Inc. was not at all similar to Ken Taylor. Taylor was hired as the Comptroller of C&M Builders, another company distinct from Murphy & Sons, Inc. Regardless of the importance Plaintiff assigns to her prior position with Murphy & Sons, Inc., she did not handle the same extent of responsibility as Ken Taylor, nor did she have the same experience or background. Ken Taylor possesses superior budgetary experience than Plaintiff. He is able to perform duties that require less supervision than Plaintiff. A review of the resumes of Ken Taylor and Plaintiff, alone, demonstrates that Ken Taylor has far superior job skills and experience than Plaintiff.

Defendant's arguments might well carry the day, were it not for plaintiff's deposition testimony, quoted above, that Gross had specifically (and that Murphy had tacitly) admitted that plaintiff had "hit the glass ceiling" and was paid less than Taylor because she was a woman.[6] At the summary judgment stage, this court is required to accept plaintiff's deposition testimony as true, and, having done so, the court has little choice but to conclude that plaintiff has established triable fact issues regarding whether defendant violated the EPA in this case. It would be difficult for this court to conclude otherwise in light of testimony that Gross had specifically admitted to paying plaintiff less because she was a woman. At the same time, the court would still emphasize that, even assuming that plaintiff's testimony is believed by the jury, this does not necessarily mean that she will be entitled to the full difference between her salary and that of Ken Taylor, if the facts establish that their objective job responsibilities were significantly different. As with the other close issues in this case, the court will more precisely address these issues at the jury instructions stage at trial.

The court now turns to plaintiff's state law claims against Gross individually. Plaintiff asserts intentional infliction with emotional distress and/or malicious interference with

---

[6]These alleged statements clearly qualify as non-hearsay admissions by a party opponent.

18

employment claims against Gross, but she cites no Mississippi case law applying either of these causes of action to garden variety sexual harassment claims such as the present one. While Gross's alleged actions are clearly reprehensible, recovery for these actions is available under federal law, and the Mississippi Supreme Court has given no indication that recovery under state tort law is available under circumstances comparable to those here. Indeed, if this court were to permit plaintiff's state law claims to go forward in this case, then this would seemingly authorize similar claims in virtually all hostile work environment cases to come before this court.[7] The court is aware of no Mississippi Supreme Court or Fifth Circuit Court of Appeals holdings supporting such a result, and the court therefore concludes that plaintiff's state law claims against Gross are not well taken and are due to be dismissed.

In light of the foregoing, it is ordered that defendant's motion [27-1] for summary judgment is granted in part and denied in part, as more specifically set forth in this order.

SO ORDERED, this the 28th day of August, 2007.


**/s/ Michael P. Mills**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

---

[7]In addition, plaintiff's intentional infliction of emotional distress claims would appear to be barred by the one-year statute of limitations applicable to intentional torts. Plaintiff suggests that "negligent infliction of emotional distress" claims might be available, but she cites no Mississippi authority in support of this suggestion.